RICHMOND,
July, 1831.

THE STATE
v.
PHILPOT.

IN RICHMOND SUPERIOR COURT, JULY, 1831.

## THE STATE vs. JOHN N. PHILPOT.

### Habeas Corpus, Attachment, and Motion to be discharged.

*In cases of habeas corpus ad subjiciendum the person imprisoned or illegally detained may petition for the writ, or any other person may do it for him.*

*The omission of the name of the person imprisoned, is not an irregularity, if enough appear to indicate the person intended.*

*Regularly, the facts stated in the petition for the writ, ought to be supported by affidavit; but still the affidavit is not of the essence of the writ, and in cases of great emergency the writ will be allowed to issue without it— in fact, to enable the party to make it.*

*Irregularities must be taken advantage of, in due time, or the party affected by them, will lose his opportunity of doing it entirely: This rule is, however, confined to mere irregularity: It is different when there is a complete defect in the proceedings.*

*The benefits of the writ belong to all free persons of every country and of every complexion; but not to a slave.*

A MOTION for Philpot's discharge was made, argued and overruled at a former term upon a state of facts precisely such as now exists. The court is again moved in this matter upon grounds not then assumed, and is prayed to reconsider its decision then pronounced. Advisement has been had upon every question raised by the counsel for the movant, and the whole case attentively considered, and the decision of the court will now be pronounced upon each distinct ground on which counsel have rested the motion.

It is contended that the writ of *habeas corpus* for the disobedience of which Philpot has been attached, is illegal and void, and that the writ, and every proceeding under it should be set aside by the court. Two causes have been assigned against the legality of the writ, and these form the first and second grounds in the motion.

The first cause is its irregularity. The first ground in the written motion submitted is "Because the *habeas corpus* by virtue of which the said John N. Philpot was brought before the court, issued illegally in this, that it issued without an affidavit to support it," though other matters besides the want of an affidavit were insisted on in argument. The particulars are three, in which the irregularity is said to consist. 1st. The petition is not by the guardian of the boy, James. 2d, The boy's name is not mentioned in the writ. 3d, Want of an affidavit. The first of these is no irregularity. It is not necessary there should exist any particular legal relation between the petitioner and person for whose benefit the writ is awarded. The person imprisoned or illegally detained, may himself petition or complain, or any other person may do it for him. Nor is the omission of the boy's name an irregularity. It can be considered but as a vagueness or uncertainty in the writ, which cannot affect its validity, if enough appear to indicate the person intended. But if it be an irregularity, we shall see whether it have not been waived. An irregularity is the non-conformity to some settled rule of proceeding, by either omitting to do something that is necessary, or doing it at an unseasonable time, or in an improper manner. If the verification of the facts contained in the petition for *habeas corpus* be something necessary to the attainment of the writ, then its omission is an irregularity.

The writ before the court is a *habeas corpus ad subjiciendum*; at common law, and nearly a century ago the Judges of England gave it as their unanimous opinion that such a

writ ought not to issue of course, but upon probable cause supported by affidavit, which has been the regular practice since. But though the writ ought not to issue regularly without affidavit, is the affidavit therefore an essential part of the writ? The case of the Lady Leigh, cited in 3 Bac. Abr. 5. shows that it is not. In that case no fact was sworn to, but that the Lady Leigh had complained in a letter to her mother, yet the court declared the writ should go to enable her to make oath to the matter complained of, and exhibited articles against her husband; and further, that the Lord Leigh, though a Peer, should be attached if he refused obedience to the writ. However, though the affidavit be not of the essence of the writ, it will never be dispensed with, except in cases of great emergency, and the omission will be adjudged an irregularity. We will consider how far this irregularity affects the present case.

In Tidd's Practice, 435, the rule of law on this subject is stated to be " that whenever proceedings are irregular, the court on motion will set them aside, provided the application for that purpose be made in the first instance; for in all cases of irregularity, the party should apply to the court as early as possible; and if he either proceed himself after discovering the irregularity, or lie by and suffer the other party to proceed, the court will not assist him." The language of the court in the case of Pearson and Rawlings, 1 East, 77, is clear and very strong. " It is the universal practice of the court, that where there has been an irregularity, if the party overlook it and take subsequent steps in the cause, he cannot afterwards revert back to the irregularity and object to it. Justice requires that that rule should be general in its operation, having in view the advancement of right. And however we may be inclined to favor persons in the situation of the defendant, yet we must not go the length of breaking in upon the general practice of the court." The same doctrine is held in the case of D'Argent and Vivant, 1 East, 330. " A defendant may waive irregularity, and is considered as having done so by submitting to the process, instead of taking steps to avail himself of the irregularity, which ought always to be done in the first instance." See also Fox and Money, 1 B. & P. 250. Davis and Owen, ib. 342. This rule is applicable, however, only to cases of mere irregularity. It is different where there is a complete defect in the proceedings. The former may be waived, but not the latter. Goodwin and Parry, 4 T. R. 577. Hussey and Wilson, 5 T. R. 254. Stevenson v. Danvers, 2 B. & P. 110.

The distinction is then plainly this, that where that is wanting, without which the whole proceedings are void, no subsequent steps will cure the defects. It is radical. But if that be wanting which will merely render the proceedings voidable, it may be waived by subsequent steps. The case of the

RICHMOND,
July, 1831.

THE STATE
v.
PHILPOT.

The writ of Ravishment of Ward, under st. 1790, was given to try the right of freedom against the claim of perpetual service, and nothing more: It will extend to no other case of the detention of free persons of color, however illegal.

An evasion and insufficient return² to habeas corpus is a contempt of court, and if obstinately persisted in, the court will punish the offender, by imprisonment until he yields obedience to the writ, or shows that it is impossible to do so.

RICHMOND,
July, 1831.

THE STATE
v.
PHILPOT.

Lady Leigh before referred to, proves that the verification of the facts contained in the petition forms no part of the process of *habeas corpus;* for in her case the writ was ordered to go, as well that she might have an opportunity of swearing to the facts as of exhibiting articles against her husband. The affidavit is not, as in bail cases, a part of the process, but is only a preliminary measure in attainment of the process, which is the writ of *habeas corpus* itself, and serves no other purpose than to convince the mind of the judge that the writ should issue, and to prevent its being abused and made the instrument of vexation. What particular showing was made to the justice who issued this writ, beyond that contained in the petition, does not appear ; no affidavit is annexed. He, however, exercising the power vested in him by law, awarded the writ, and much proceeding has been had upon it, though the petioner has not yet sworn to the facts in the petition. Let us look to these proceedings or subsequent steps, and see if enough has not been disclosed by Philpot himself to convince the court of the propriety and even necessity of issuing the writ in the first instance, and to amount to a waiver of any irregularity.

The first step taken by Philpot is his appearance in obedience to the writ, and moving to adjourn the return to a future day, to enable him to produce the boy, whom he admitted to be in a certain place, which motion, (the petitioner consenting) is allowed.

The next is filing his return, in which no exception is taken, for want of an affidavit, nor averment made that the boy is a slave, though it is insisted that negroes or persons of color have no right to the writ. Then an argument upon the sufficiency of the return, which was adjudged evasive and insufficient, and an attachment ordered. And lastly, a motion for discharge from the attachment, on two grounds. 1. Because the period of imprisonment being indefinite and unlimited the order was illegal, and secondly, Because the contempt was purged.

It is then disclosed and made as manifest to the court as any affidavit could make it, if Philpot's statements and admission are to be believed, that he had in his custody, power or control, the boy James, averred to be free, and the fact not denied by Philpot, or the boy claimed by him as a slave, or any other cause assigned for detaining him. The facts contained in the admission authorized the writ ; the evasive return and subsequent events brought to the notice of the court by Philpot himself render it necessary to demand its strict obedience, and justice forbids that it should fail of its effect by reason of too nice an adherence to forms. And surely unless the affidavit be of the very substance of the process itself, the subsequent steps taken in this cause have

waived the irregularity. It is the opinion of the court that it has been waived, and that it is now too late to object to or take any advantage from it.

The 2d ground is, " because it (the writ of *habeas corpus*) issued illegally in this, that it issued in behalf of a negro admitted to be such in the petition, and also admitted in the petition to be claimed as a slave. By reason of which two grounds aforesaid the whole subsequent proceedings were illegal and void." Before we proceed to consider this second ground, it may be well to notice an error into which the counsel for the movant have fallen, in supposing it to be admitted in the petition, that the boy was claimed as a slave ; on the contrary both in the petition and writ he is averred to be a free boy in the possession of Philpot, and in his return Philpot does not claim him as a slave nor aver him to be such otherwise than may be inferred from the legal presumption against the freedom of the negro race. The argument took a wide range, and it was contended that *free* negroes or persons of color, were not, under the constitution and laws of Georgia, entitled to the benefit of the writ, which was designed alone for free white citizens.

It might perhaps be sufficient upon this point to remark, that with but a single exception known to the court, the decisions and practice throughout the State are now, and have been uniform, to extend to this class of persons the benefit of the writ of *habeas corpus.* But as their exclusion has been insisted on with much zeal, as well upon constitutional law, as upon expediency and policy, the court will examine the principles which are said not only to authorize, but to require such exclusion.

This writ is called a constitutional writ, and upon the word constitutional is rested the strong argument for the exclusion.

The constitution it is argued was made by free white citizens and for free white citizens ; the writ of *habeas corpus* is secured by the constitution, and is therefore a remedy exclusively for the benefit of free white citizens. Neither the force of the argument nor correctness of the conclusion is perceived. It is most true, the constitution was made by free white citizens ; and it is equally true that the writ of *habeas corpus* is secured by it, and that constitution and writ were both for their benefit ; but it does not necessarily follow that they were for their exclusive benefit. A constitution is but a law declared by the people of a state in the exercise of their inherent and unrestrained sovereignty, and is, like laws enacted in the course of ordinary legislation, binding upon all persons within the limits of the state, (and obedience and protection are correlative terms) though unlike such laws in this, that it not only governs individuals, but also restrains and controls the different departments of government itself. Both constitution

50

and laws are to be so construed as to arrive as nearly as possible at the intention of those who framed them, and neither add to, nor detract from the distinctions, limitations or restraints therein expressed. Bring to the test of these plain obvious principles the proposition contended for, that the writ of *habeas corpus* was intended for the exclusive benefit of free white citizens, and say if it be true. If true, then it was the intention of the framers of the constitution and of the people of Georgia, who adopted it, to deprive every Frenchman, Englishman, or other foreigner who might come among us, of its benefit until he should have been naturalized. But enlarge the proposition and extend the writ to free white persons, which will embrace aliens if they happen to be white, and this supposed intention of the framers of the constitution would not be much less absurd; for then the benefit of this salutary writ would be made to depend upon the particular complexion of the individual, and not upon his political or social relations, and the red men whom we are subjecting to our laws would be forced to their obedience without enjoying their protection; and would be left to the mercy of every ruffian who might choose to seize upon their persons. But the constitution recognizes no such distinctions. Its words are very plain and general. "The writ of *habeas corpus* shall not be suspended unless when in case of rebellion or invasion the public safety may require it." Here the writ is spoken of as a remedy well known, and all that the people of Georgia did, by this act of their sovereign power, was to place its future existence in dependence alone upon their sovereign will, except in cases of great emergency. The powers of the writ are neither enlarged nor diminished, nor is any particular class of persons indicated for whose exclusive benefit it is designed. By reference to the constitution of 1789, that under which the convention sat, which framed the present one of 1798, we find that "all persons shall be entitled to the benefit of the writ of *habeas corpus*" are the general and comprehensive terms by which the remedy is secured. In the constitution of 1777, the first made by the people of Georgia, although the writ itself is not in express terms secured, yet "the principles of the *habeas corpus* act are made a part of this constitution."

It cannot therefore be doubted, that it not only now is, but ever has been, since Georgia has become a sovereign State, her will and intention to preserve the writ as beneficially and perfectly as it existed, or was known to her while in a state of colonial dependence, or as it existed in the mother country whence it is derived. Do any of the distinctions here sought to be established exist there? None. When the writ is applied for, no inquiry is made as to the complexion of the petitioner, or the place of his permanent allegiance. All, of every condi-

RICHMOND,
July, 1831.

THE STATE
*v.*
PHILPOT.

tion, of every country and of every complexion, are equally entitled to it, the native of South Africa, not less than the Peer of the Realm.

But it is insisted, that the existence of slavery among us, and the provisions of the act of the 10th May, 1770, create the distinction; that slaves are considered in law as things, mere property and not as persons; that they are unknown in England, and therefore the writ could not and cannot extend to them, and that the act of 10th May, 1770, a colonial statute, declares " it shall always be presumed that every negro is a slave, unless the contrary be made to appear," and that the constitution was adopted with a view to the state of things created by the existence of slavery and with reference to the act of 1770, regulating the condition of slaves; that the general presumption being against the liberty of the slave race, those who are free can be in no better condition to demand the writ than the slave; and that the slave being always considered in the legal possession and power of the master, cannot be said to be illegally detained by him, or be entitled to this writ. Let it be remembered, while these positions are examined, with a view to ascertain their bearing on the present question, that it is not whether a slave may have the writ, but whether it may be legally awarded to a free person of color.

It is true, slaves are property, and by the act of 10th May, 1770, are declared to be personal chattels in the hands of their owners, and to be alienable, but it does not thence follow that they are mere things, horses, as was contended in argument. This property or ' personal chattel,' consists in the right of governing the slave, subject to such restraints as the legislature may impose on the master, and of enjoying his perpetual and involuntary service. The law has never yet ceased to consider slaves, though thus subject to the government and service of a master, as human beings, subject to its protection, and bound to obey its requirements. And so careful were the people of Georgia on this subject, that in their Constitution, 4th article, 12th sec., the life and members of slaves are expressly protected in the same manner as the life and members of free white persons are. They are subjected to general laws. See acts of 1811, 1816, and the laws throughout on this subject. They have secured to them a formal trial for all offences, and the right of examining witnesses, and in capital cases, the right of trial by jury. They cannot be tried twice for the same offence. Act of 1803, sec. 4. Their persons are protected from violence and cruelty, none but the master having a right causelessly to strike or whip them, and the master himself being restrained to such moderate chastisement as may be necessary for discipline and the preservation of a just subordination. They have likewise secured to them from the hands of the master all

RICHMOND, July, 1831.

THE STATE
v.
PHILPOT.

care, food, sustenance, and clothing, proper and necessary for them, and an exemption from excessive labor. Code of 1817, 36 and 37 sec. 11th division.

It is apparent, then, that though slaves have no political rights, nor right of property, they have many personal rights, and are very far from being considered mere things, brutes, and and beasts of burden. A right of the benefits of a *habeas corpus* does not however belong to a slave, as it would be inconsistent with the rights of the master. This writ not having been sued out for a slave, but for a free person of color, it is insisted that they all stand upon the same footing in this regard by virtue of the general presumption against the liberty of the slave race. This is carrying the presumption of law too far. By looking into the act of 1770, it is seen, that free negroes who then were or might thereafter be in the province, as well as such as might thereafter become free, are expressly excepted not only from that part of the act which fixes the condition of the slave race, but also from that which declares the presumption. But suppose there were no such exception, let us look to the act, and see the extent of the legal presumption, and whether it be so general as to place slaves and free persons of color upon the same footing. By doing so we shall find that it is confined to actions or suits between the guardians of negroes and their masters, to try the negroes' right to freedom, and is a rule of evidence applicable to such cases only. Now it would be a very hard and unreasonable construction of a mere rule of evidence, to make it reduce a whole class of free people to a level with slaves, deprive them of the most effectual means of protecting their personal liberty, and subvert a constitutional provision.

There is a very broad and obvious distinction between the rights and condition of slaves and free persons of color. Slaves, as we have seen, are not mere things, and have many personal rights secured to them by law, but are without the right of personal liberty or any political rights whatever. Free persons of color are equally destitute of political rights, are somewhat abridged of personal rights, but enjoy in its fullest extent personal liberty. To protect this latter right wherever enjoyed, to restore it wherever unlawfully deprived, the *habeas corpus* was designed, and in a state of society just such as now exists among us, was engrafted upon the Constitution. The slave, therefore, without personal liberty, is without the benefit of the writ: the free person of color enjoying personal liberty has the benefit of the *habeas corpus* secured to him by a constitutional guaranty.

There is another objection to the allowance of this writ to free persons of color, arising out of the act of 1790, on which great stress was laid in argument, which is this, that as the act has given a remedy by writ of ravishment of ward, all other remedies were superseded by it.

RICHMOND,
July, 1831.

THE STATE
*v.*
PHILPOT.

The argument in support of this objection proves rather too much. It admits the existence of the remedy by *habeas corpus* before the superseding act. If it existed then, it exists still, except only so far as it has been superseded. The statutory writ was given to try the right to freedom against the claim of perpetual service, and nothing more. It will reach to no other case of the detention of free persons of color, however illegal. What would then be their situation? Those who have the clearest right to freedom would be most exposed to lawless violence, and giving the means of trying their freedom, to those of doubtful right, would be made to take all remedy from those acknowledgedly free, or the *habeas corpus* must remain to them full and perfect. But if the writ may issue in favor of any one free person of color, in any given case of illegal detention, it may issue for all and in every case; for neither the Constitution nor law has made any exception. What the court might do upon the return of the writ is another question. Should it be obeyed, and the return show a claim of property as a slave in the person for whose benefit it issued, he would no doubt be left to his remedy under the act. On the subject of the act of 1770, there is this farther remark to make, that if there be any thing in it inconsistent with the remedy of *habeas corpus*, the statute must be considered so far repealed, as well because the Constitution which establishes the *habeas corpus* is a posterior law, as because it is paramount to every legislative enactment. Much has been said about the expediency and policy of allowing a *habeas corpus* to this class of persons. These are considerations for another department of government. Here they can have no place, the only question being whether such is the law, not whether it is expedient and politic that it should be so. It should never be forgotten, however, by any, that there can be no true and sound policy which is opposed to strict and impartial justice; and that both individual and general happiness and security are best attained by a prompt and cheerful obedience to just and humane laws.

The 3d, 4th, and 5th grounds of the motion are, that no contempt has in fact been committed by Philpot; that his return is neither evasive nor defective; and that it should be received as conclusive.

If the court have authority to issue the writ, it follows of course, that it has the power to compel obedience to it; and no higher contempt can be conceived, than a refusal to submit to such power, and an obstinate disobedience. That disobedience is contempt, has not been, and cannot be denied, on the contrary is admitted, but at the same time it is contended, that the return of the 2d November, 1829, is an act of submission, which being full and perfect, no disobedience is chargeable upon him. This return has been well considered on a former occasion, and of its evasiveness and insufficiency,

it was then thought, there could be no serious question. Such is still the opinion of the court. To have been full, it should have denied the custody, possession, power or control of the boy, not only at the time of the return, but also at the service of the writ. For the court to receive as sufficient, any return short of this, would be to enable all who might choose to evade the writ, easily to do so, by simply transferring the person confined to another between its service and return. The return of Sir Robert Viner, cited 3 Bac. Abr. 14, which was adjudged to be insufficient and equivocal, is very like the present. That was to a pluries writ, there having been no return to the first and second. The return was " that at the receipt of this writ, nor at any time since, has she been in my custody." This was held by the court to be insufficient, because upon return to a pluries writ " he ought to say not only at the time of the receipt of this writ, but of any other," and equivocal because it simply denied the custody of the person alleged to be confined. The only difference between that case and this, is that this is a return to a first, that to a pluries writ. But the same obedience and the same return are required to each, and it is not our practice to issue alias and pluries writs, which leads to unnecessary expense and delay, but to enforce the first. If Philpot's return had shown, that neither at the service of the writ, nor at any time since, had the boy been in his possession, custody, power or control, it would have been full and perfect ; but he evades a part, and will not swear that at the service of the writ the boy was not in his power or control. Had Philpot, however, sworn that the boy was not in his possession, power or custody, still, if upon looking into the facts stated in the return, the conscience of the court should not be satisfied that all the material facts were disclosed, it was not bound to discharge him. In looking at his return, the conscience of no man can be satisfied that all the facts are disclosed, but must be convinced that very material facts are suppressed ; and this conclusion, to which the return itself would lead, becomes irresistible to the mind of the court, when it recollects the admission of this suppressed and most material fact by Philpot himself since the service of the writ, which fact is, that he had the boy.

A great deal of argument has been offered by counsel for the movant to show that the return should have been received as conclusive. That it is conclusive, the court has always held ; and if it have erred at all on this point, the error has been in holding the return too conclusive, not only as against the applicant for the writ of *habeas corpus*, but also as against Philpot himself. He cannot be permitted even to amend his return when once filed, 3 Bac. Abr. 14, much less to contradict it, or aver any thing inconsistent with, or repugnant to it.

The 6th ground " Because, if any contempt was committed, it was purged by the affidavits of Philpot, Carey, Tur-

RICHMOND,
July, 1831.

THE STATE
v.
PHILPOT.

ley, and the certificates filed in the cause," has been formerly insisted on, and well considered by the court, and its opinion, then expressed, is still entertained. That the return is an evasion of the writ, is a matter about which there can be but little difference of opinion ; and that an evasion of the writ is a contempt of court, admits of but as little doubt. As soon therefore as the return of the 2d November was filed, Philpot was in contempt, and liable to be attached. But the court before awarding an attachment, called upon the defendant to show cause why it should not go against him. The cause shown was but an attempt to amend his return, which could not be allowed. Philpot's admissions and conduct on the 17th October, followed by his evasive return, manifested a disposition to trifle with the authority of the court, and placed him in an attitude towards it which rendered some unequivocal act of submission, and earnest and sincere effort to obey its process, necessary to extricate him from the situation in which he had thus voluntarily placed himself.

The rule to show cause was to furnish him an opportunity of making this submission, and showing this effort, or of yielding actual obedience. Not the slightest effort at obedience being shown, and the paper amendatory of the return and contradictory of the previous admission being rejected, an attachment became unavoidable, unless the court would surrender its own authority. At this stage of the proceedings, the case is clear. Philpot is manifestly in contempt, and his punishment is the direct and inevitable consequence of his own conduct. Has his case been changed by any thing which he has since done? He has in fact done nothing, and yet it is said, if he were then in contempt, he is now purged of it. The contempt, it must be recollected, is his evasion of the writ, and disobedience of its requirements. Not an act of his has been shown, nor an effort on his part to obey, although six months elapsed from the return of the writ until the removal of the boy, during all which time he was kept within a few miles of Philpot's residence, in the place where he had himself deposited him, and was for sale, which could not but have been known to him, and Philpot at large, free to exert all his energies.

Great reliance is placed on the affidavits of Carey and Turley. That of Turley shows nothing but that on the 28th May, 1830, he purchased the boy from Carey, and the next day removed him to the western country, where he sold him. Carey's affidavit shows his purchase of the boy from Philpot between the 6th and 13th October, 1829, having contracted for him some days before ; that the boy had not been since in the possession, power, or custody of Philpot, and that some time since he had sold him, and does not know where he is.

These affidavits, so far from acquitting Philpot of his contempt, by showing an effort and sincere desire to obey the

writ, and an entire failure in such effort, and an inability on his part, lead the mind rather to an opposite conclusion. It will not be forgotten that these are voluntary affidavits of persons not subject to the process of the court, or bound to state more than in the opinion of Philpot might suit his purpose, and were prepared under his direction, and to effect his enlargement after he had been attached. Hence only that is stated which may have been supposed sufficient to attain that end ; and hence, in Carey's affidavit, the mystery which is left to hang over the condition of the boy, the person to whom he had been sold, the direction in which he had been sent, the circumstances under which he had been purchased by Carey from Philpot, and their knowledge or ignorance, at the time, of the boy's claim to freedom. It is not disclosed that Philpot sold the boy to Carey without a knowledge on the part of either or both of them, that the boy was free, or had any claim to freedom ; that Carey gave any consideration for him ; that after Philpot's admission of having the boy, and either before or since his return, he ever made any application to Carey for the boy, and that Carey had refused to re-deliver him, or that Philpot had adopted any measures whatever to regain possession of him. Nor indeed was Carey bound to make any such disclosures, his affidavit being purely voluntary, yet the omission to make full and entire disclosures as to the boy, greatly weakens the effect of his testimony in Philpot's behalf ; and taken in connexion with all the circumstances of this transaction, excite a suspicion, that, though he may not have been actually a partaker with Philpot, yet that he was not wholly ignorant of his (Philpot's) attempt to evade the writ. But to give the fullest force and effect to the affidavits of Turley, Carey, and of Philpot himself, still, no one single act of obedience to the writ, or the slightest disposition to obey it has been shown, while throughout the whole case there appear to have been continued and obstinate struggles to elude and evade.

The 7th ground is that " the order of imprisonment was illegal in this, that it imposed upon Philpot a condition which it was impossible for him to perform, and because the court was not authorized to require the production of the boy, as the condition of his purging his contempt, if any were committed." As has been repeatedly said, the attachment was for an evasion and disobedience of the writ, and the only condition imposed on him was obedience. His imprisonment was not made to depend upon the arbitrary will of the judge, but upon his own will, if that will should lead to action. That such an order is not illegal, must be manifest to any one who considers the order and allows to the court the power of enforcing its own process. Such orders are of common occurrence and are absolutely necessary for the attainment of justice. They are issued and enforced against sheriffs, jus-

tices of the peace, and constables who collect money and neglect or refuse to pay it over when ordered to do so; to compel the production of personal chattels under a warrant for restitution, and in a variety of instances of small importance, compared with personal liberty; and it would be a very singular defect of power in the court, not to possess the same means of enforcing the writ of *habeas corpus.* If the court had a right to issue the writ, it had the right to compel the production of the boy, and to use the only means adequate to the attainment of that end. The indefinite use of the means beyond the attainment of the end, would be illegal and improper: up to that period it is both legal and proper.

The opinions of Senator Clinton as delivered in the case of Yates against the people, 6 John. Rep. 507, were much relied on in argument. How these opinions can be construed into a support of the principles assumed in this 7th ground, the Court has not been able to perceive. The position for which Mr. Clinton contended, and successfully too, was that every commitment to be legal, must be definite and terminable, either by the efflux of time, or *on the doing of some act by the prisoner.* In speaking of imprisonment made to depend on the doing of some act by the prisoner his words are, "and where an imprisonment is made to terminate on the doing a certain act on the part of the prisoner, every legitimate object will be answered, and his course of future conduct expressly marked out. He will not depend for his liberation upon the varying volition or fluctuating caprice of the judge." The direct application of these opinions to the present case is readily made by every one, but fully to sustain it. That the production of James is impossible, remains yet to be shown.

The 8th ground is "That the court had no jurisdiction over the said John N. Philpot after the return was filed, and therefore all the subsequent proceedings were null and void."

If the position here assumed be true and this ground is tenable, it follows by necessary consequence, that the filing of any return, of whatever character, to a *habeas corpus* is equivalent to a discharge of the defendant, and that the court can in no case inquire into its fulness or sufficiency; or if it do inquire and find the return imperfect and evasive, it at the same time makes the humiliating discovery, that the very act of contemning its authority has deprived it, not only of all power to protect the innocent and helpless who seek its shelter, but also of the power of self-protection. The jurisdiction and power of the court cannot, however, be thus easily evaded; for when once it takes cognizance of a cause it will see that full and ample justice be done, nor will it release its hold of the defendant until that end be attained.

The 9th and 10th grounds are the opinions of Judge Crawford and Judge Lamar, under both of which it is said Philpot should be discharged.

RICHMOND,
July, 1831.

THE STATE
*v.*
PHILPOT.

At the last term, Judge Lamar being present and sitting with the Judge of the middle circuit, a motion for Philpot's discharge was argued ; and the court being divided upon what forms the 6th ground of the present motion, the defendant could take nothing by his motion then made ; upon which the whole case being referred to Judge Crawford, by consent of parties, that judge concurred with the opinion opposed to the motion ; and in pronouncing his decision, after an attentive consideration of the case, and upon a review of all the grounds then assumed, declared that " upon the whole, Philpot ought to remain attached, until he produces the boy James, or shows that it is impossible to produce him." In order to have the benefit of Judge Lamar's opinion, which was favorable to the motion upon the ground stated, and it may be added, upon that ground alone, it is contended that but a single Judge can legally sit in our Superior Courts : and that Judge Lamar having been present, by request, at the argument, and sitting with the presiding judge of the district, the authority of the latter was in that particular case superseded. It is not necessary to go into much argument on this subject. The judges of the Superior Courts, though elected for the service of a particular district, have a general commission for the whole State, and the authority vested in each judge is exactly equal. Any one of them may hold any court in the State ; but there is nothing in their commissions, the laws or the constitution to prevent a greater number, or all of them from sitting together, if they should happen to be present. Yet if it were the law that one only may sit, and two should be present, which of them would be in power ? The presumption would seem to be in favor of the presiding judge of the district, and if in him, it would be criminal courtesy to abandon a deliberately formed and settled opinion in favor of a visiting brother, in whatever estimation that brother might be held, either for worth and integrity as a man, or learning and ability as a judge. It is held, however, that the power of each judge present was equal, and that the motion was lost by the division of opinion.

The court repeats its regret heretofore expressed, for the situation in which the movant has thus voluntarily placed himself, and the necessity he has imposed upon the court of exerting against him its extraordinary power for the advancement of justice ; and after having attentively and advisedly considered every ground submitted, and weighed every argument offered, feels bound to adhere to the decision pronounced by Judge Crawford on the former motion " that Philpot ought to remain attached, until he produce the boy James, or shows that it is impossible to produce him."

The motion is therefore overruled.